In re ESTATE OF HANNAH H. ADAMS, Deceased, W. W. MOR-
ROW, Treasurer, Appellee, v. SAID ESTATE, Appellant.

**Taxation of personal property:** SITUS. As a general rule the situs for
taxation of personal property is the owner's domicile; but the legis-
lature may fix a local situs to personal property quite distinct from
the owner's domicile.

**Same:** TAXATION OF SECURITIES. Securities for debts may have a busi-
ness situs either at the residence of the debtor, or at some other
place than the domicile of the creditor; and as to succession taxes
securities may have a situs either at the domicile of the debtor or at
the place of their actual situs.

**Same:** BUSINESS SITUS: COLLATERAL INHERITANCE TAX. Where a non-
resident loaned money through a resident agent of this state, who
kept and deposited the securities in a bank in this state, such se-
curities had a business situs here and were subject to the collateral
inheritance tax; and the fact that the owner withdrew them from
the state, delivered them again to her agent who deposited them in
the nearest bank outside the state, with a view of defeating the tax
in case of the owner's death, was ineffectual for that purpose.
WEAVER, EVANS, and GAYNOR, JJ., dissent.

*Appeal from Allamakee District Court.*—HON. L. E. FELLOWS,
Judge.

TUESDAY, NOVEMBER 24, 1914.

APPEAL from an order of the district court imposing a
collateral inheritance tax upon a part of the estate of Hannah
H. Adams, deceased.—*Affirmed.*

*M. B. Hendrick, D. J. Murphy,* and *H. H. Stilwell,* for
appellant.

*George Cosson,* Attorney General, *N. J. Lee* and *H. E.
Taylor,* Special Counsel, for appellee.

DEEMER, J.—Hannah H. Adams died in the city of Chicago on August 6, 1904, without direct issue. She left a will whereby she disposed of her entire estate to collateral heirs. At the time of her death, and for many years prior thereto, she had been a resident of the state of Florida. Her will was probated in Orange county in said state, and M. B. Hendrick and J. N. Eddy, both residents of Allamakee county, this state, were appointed executors of the will, and as such they duly qualified and administered upon the estate, making distribution thereof among the several legatees and devisees. On November 1, 1909, the county attorney of Allamakee county made application to the probate court therein for the appointment of an executor or administrator in this state, and on the 9th day of that month what are called auxiliary (ancillary) letters of administration were issued to one J. M. Collins, commanding him to, among other things, take possession of all money and estate of Hannah H. Adams, deceased. On December 2, 1909, the county attorney filed in said estate an application for the taxing of a collateral inheritance tax upon certain notes and mortgages held by deceased at the time of her death. This was answered by Hendrick, executor, his coexecutor at the time being dead, and by certain legatees and devisees under the will of Hannah H. Adams. In this resistance they pleaded that deceased was, at the time of her death, a nonresident; that none of the notes and mortgages were held in this state at the time of her death, by agent or otherwise; that they were in fact in possession of decedent outside of this state. On the issues thus joined, the trial court held that certain property described in the application, which consisted of certain notes, the most of which were secured by mortgages upon real estate in this state, was subject to a collateral inheritance tax, and the same were ordered appraised by the collateral inheritance tax appraisers. The respondents to the application appeal.

The property in question consisting of notes, nearly all of which are secured by mortgages upon real estate in this state, passed by the will of testatrix to collateral heirs, and, if it had

a situs in this state at the time of testatrix's death, was subject to our collateral inheritance tax, although testatrix was a nonresident at the time of her demise. The record shows that the property in question originally belonged to testatrix's husband, one D. W. Adams, who died a resident of Florida in the year 1897. Adams had for years carried on a loaning business at Waukon, in this state, through M. B. Hendrick, who was afterward appointed one of testatrix's executors. One L. A. Howe, an officer of the Waukon State Bank, also held a power of attorney authorizing him to cancel and release mortgages of record taken in Adams' name, and also a power of attorney for the same purpose from Hannah H. Adams. He acted in conjunction with Hendrick in the matter of making loans of Adams' money. Loans were made from time to time by Hendrick, and checks signed "D. W. Adams, by M. B. Hendrick," were paid by the bank to the persons borrowing money. The securities taken for the loan were held by the bank until paid, and were then delivered to the makers. Hannah H. Adams acquired title to all her husband's property by will or otherwise, but the loaning business was continued in Allamakee county just as it had been before her husband's death. No applications for loans were sent to either Mr. or Mrs. Adams. They were made either to Hendrick or Howe and accepted by them, and checks were issued by Hendrick, as aforesaid, when the loans were made. Payments upon loans were made to the bank, and the money placed to the credit of Adams, to be reloaned as occasion offered. All the notes and mortgages were deposited in the bank and remained there until August 3, 1904, when Hendrick, as is claimed under the direction of Hannah H. Adams, obtained all the notes and mortgages from the bank, giving his receipt therefor, and took them to Chicago, where Mrs. Adams then was; and it is claimed that through her direction he took the said securities to Prairie du Chien, Wis., and there deposited them in a bank, where it is said they remained until after the death of Mrs. Adams. The power of attorney issued to Howe was not revoked, save by the death of

Mrs. Adams. The securities remained in the Prairie du Chien bank, where they were left for safe-keeping, until after the death of Mrs. Adams and the appointment of Hendrick as one of the executors of her estate, when they were received by said Hendrick and, as he claims, administered upon by him pursuant to his appointment as executor.

The question is: Are these securities liable to a collateral inheritance tax in this state? The general rule is that personal property follows the person, and that its situs, for the purpose of taxation, is the domicile of the owner. "Mobilia sequuunter personam" is the principle usually applied. But it is well settled that the Legislature may give a local situs to personal property quite distinct from that of the owner's domicile. *New Orleans v. Stempel,* 175 U. S. 309, (20 Sup. Ct. 110, 44 L. Ed. 174); *Bristol v. Washington Co.,* 177 U. S. 133, (20 Sup. Ct. 585, 44 L. Ed. 701); *State Assessors v. Comptor,* 191 U. S. 388, (24 Sup. Ct. 109, 48 L. Ed. 232); *Goldgart v. People,* 106 Ill. 25; *Hutchinson v. Board,* 66 Iowa, 35; *In re Jefferson,* 35 Minn. 215, (28 N. W. 256); *State v. Ins. Co.,* 80 Minn. 277, (83 N. W. 339); *Finch v. York County,* 19 Neb. 50, (26 N. W. 589, 56 Am. Rep. 741); *Hubbard v. Brush,* 61 Ohio St. 252, (55 N. E. 829); *Billinghurst v. Spink Co.,* 5 S. D. 84, (58 N. W. 272); *Buck v. Miller,* 147 Ind. 586, (45 N. E. 647, 47 N. E. 8, 37 L. R. A. 384, 62 Am. St. Rep. 436); *Parker v. Strauss,* 49 La. Ann. 1173, (22 South. 329); *Liverpool Co. v. Board,* 51 La. Ann. 1028, (25 South. 970, 45 L. R. A. 524, 72 Am. St. Rep. 483); *People v. Ins. Co.,* 29 Cal. 534; *Buck v. Beach,* 164 Ind. 37, (71 N. E. 963, 108 Am. St. Rep. 272).

1. TAXATION OF PERSONAL PROPERTY: situs.

But it has been doubted if the Legislature has power to fix the situs of securities at the residence of the debtor, if the creditor had a domicile elsewhere, and there is no agency within the state, or the securities are not there present. *State Tax on Foreign-Held Bonds'* 15 Wall, 300, (21 L. Ed. 179); *Detroit v. Lewis,* 109 Mich. 155, (66 N. W. 958, 32 L. R. A. 439). But

2. SAME: taxation of securities.

see, *contra, In re Whiting,* 150 N. Y. 27, (44 N. E. 715, 34 L. R. A. 232, 55 Am. St. Rep. 640). Courts everywhere hold, however, that personal property may have a business situs either at the residence of the debtor or at some other point than that of the domicile of the creditor, and, as to succession taxes, personal property in the form of securities may have a situs either at the domicile of the debtor or at the place of their actual situs. *Gallup's Appeal,* 76 Conn. 617, (57 Atl. 699) ; *Detroit v. Lewis,* 109 Mich. 155 (66 N. W. 958, 32 L. R. A. 439) ; *In re Phipps,* 77 Hun, 325, (28 N. Y. Supp., 330), affirmed in 143 N. Y. 641, (37 N. E. 823) ; *Lewis' Estate,* 203 Pa. 211, (52 Atl. 205).

If the property sought to be charged had a business situs in this state, it was under our statute (Code Suppl. Section 1467) subject to our collateral inheritance tax. That it had such situs down to the time it was taken to Chicago, three days before testatrix's death, is very clear. The loaning business of both D. W. Adams and his wife had been given a local situs in this state, and the securities were kept here down to their removal to Chicago and Prairie du Chien. It is well to state here that Prairie du Chien is just across the Mississippi river from Allamakee county, and is the nearest railway station to Waukon outside of the state. But it is beyond question that the securities were physically at Prairie du Chien in a bank for safekeeping when testatrix died, and they are not therefore subject to the tax, unless constructively in this state at the place of their business situs or by reason of the fact that they were practically all secured by mortgages upon real estate in this state. We must inquire then, first, how the securities came to be at Prairie du Chien. The record shows the following with reference to this matter; the only testimony being as follows:

*3. Same: business situs: collateral inheritance tax.*

My name is M. B. Hendrick. The securities listed in Exhibit 1 were given to me by the Waukon State Bank on August 3, 1904. Q. How did you come to go to the bank and get these securities? A. I was ordered to do so by Mrs. Adams.

Mrs. Adams was in the city of Chicago, state of Illinois, when she directed me to get those securities, and she told me to take them to her where she was in Chicago, and I did so. After taking them to Mrs. Adams, they were deposited in a bank outside of the state of Iowa, and remained there until after the appointment of the executors of her estate; then they were brought here for collection after the appointment of the executors. I was appointed one of the executors in the state of Florida probate court of Orange county on the 15th day of August, 1904. Nearly all of the notes and securities described in Exhibit 1 were collected and distributed under the orders of the probate court of Florida, and those not collected were ordered distributed in pursuance to an order of the Florida probate court by myself and my associate executor. . . . I think my business with Mr. Adams commenced before he left here. From that time up until the death of Mrs. Adams, I was well acquainted with her and familiar as to where her residence was. I saw her at Chicago, a short time before her death. I saw her a good many times after she went to Chicago to be treated. She was in the hospital for two or three weeks, and then was taken into the house of Mr. Charles Campbell, either on Seventy-Second or Seventy-Third street on the Illinois Central Suburban running to Fulton. She remained at the home of Mr. Campbell five or six weeks. She went there the last of June and died on the 6th day of August. She was under the doctor's care. She had undergone a very severe operation. Mentally the woman never was brighter than up to a few days (10 or 12 days) of her death. I was told the operation was quite severe. She had no severe sickness. . . . I remember seeing Mrs. Eddy on the 4th day of August, 1904, just previous to her death. I don't know why she was called down. The character of the notes and mortgages and other securities taken from the Waukon State Bank in August, 1904, were not changed until they were inventoried in the estate and none of them sold. I don't know of any change. I think the inventory was dated May 5, 1905, and was made as the assets were at the time of her death. I think quite likely that, between the 6th of August and the time of making the inventory, there were payments made on these notes. The payments were made to me at Waukon, Iowa. So far as I was connected with them, there was no change from August 3, 1904, until a day or two after the death of H. H. Adams. I think that, while I was in Florida being appointed

as executor, there was some party went to the bank, and Mr. Howe received a payment of $200 or $300. This would be some time I think in August, 1904. I took possession of these notes and securities listed in Exhibit A after my appointment as such executor. I knew where they were prior to that time. They were where I had left them. I went and got them after my appointment as executor. There was no necessity for the notes and mortgages to be here until I was appointed executor. There was nothing to do with them. I was away from the 11th day of August, 1904, until about the 20th or 22d of August, when I brought the securities home with me, after my appointment as executor. I know these notes, mortgages, and securities listed in Exhibit 1 were outside of the state of Iowa on August 6, 1904, from my own personal knowledge. I had taken them out of the state. I took them on the 4th day of August, from Mrs. Adams. Then I placed them in a bank for safe-keeping. That bank was in the city of Prairie du Chien, state of Wisconsin. I placed them there on my return from Chicago, myself. And they remained in the bank at Prairie du Chien until I was appointed executor of the estate of H. H. Adams, deceased, in the state of Florida. . . . The city of Prairie du Chien is about five miles from the southeast corner of Allamakee county. I don't know the exact distance. It is the nearest railroad station from Waukon outside of the state of Iowa. . . . There was no necessity for the notes and mortgages to be here. There was nothing to do with them. I was away from the 11th of August, 1904, until about the 20th or 22d of August, when I brought the securities home with me, after my appointment as executor. Q. You had taken them yourself outside of the state, had you, Mr. Hendrick? A. I had. Q. And had them under your control when you took them outside of the state and left them outside of the state, were they, Mr. Hendrick? A. I took them on the 4th day of August, from Mrs. Adams, and then I placed them in a bank for safe-keeping. Q. And that bank was in the city of Chicago, was it, or where was it? A. That bank was in the city of Prairie du Chien. Q. Wisconsin? A. Wisconsin. I placed them there on my return from Chicago. Q. And you placed them there in that bank yourself did you, Mr. Hendrick? A. I did; yes, sir.

The fair inference from this testimony is that Mrs. Adams, who was temporarily in Chicago, and was very sick, directed

Hendrick to get the securities held by the Waukon Bank and take them to Chicago. This was done; Hendrick executing a receipt to the Waukon Bank for the securities. Arriving at Chicago, he gave the securities to Mrs. Adams, and she handed them back to him, and upon his own motion he returned and placed them in the bank at Prairie du Chien for safe-keeping, still having power thereover in virtue of his original arrangement. There can be no doubt in our minds that this transaction was had to avoid our collateral inheritance tax laws, and that Hendrick still retained control over the securities and either received payments thereon or was authorized to do so until the revocation of his authority by the death of Mrs. Adams. The ultimate question then is: Did this removal of the securities by Hendrick, with the consent of Mrs. Adams, and the placing of the same in the Prairie du Chien bank, relieve the same from the collateral inheritance tax? The writer is of the opinion that it does not. True, the property was not physically present in this state at the time of Mrs. Adams' death, but this fact is not controlling in our opinion. Although not physically present, the loaning business established in this jurisdiction still continued. Mrs. Adams' agents still had power to collect, to get the securities which were simply left for safe-keeping in the bank at Prairie du Chien, and to deliver them to the makers. The fair inference from the record is that these securities were left in the Wisconsin bank by Hendrick and in his name, and that, although in Wisconsin, they were there simply for safe-keeping, and were in fact in the constructive possession of Hendrick in Iowa. If Hendrick had been the owner and had deposited the papers in the Prairie du Chien bank simply for safe-keeping, as the record shows he did in this case, there would be no doubt that the property would have been subject, not only to general taxation in this state, but also subject to the collateral inheritance tax. Instead of being the owner, he was in possession as an agent for the owner, who had such control over the paper that it was taxable here, and the securities at all times

were constructively in Iowa. The following cases support this conclusion: *In re Merriam Est.*, 147 Mich. 630, (111 N. W. 196, 9 L. R. A. (N. S.) 1104, 118 Am. St. Rep. 561, 11 Ann. Cas. 119); *Hunter v. Board of Supervisors*, 33 Iowa, 376; *Bristol v. Washington County*, 177 U. S. 133, (20 Sup. Ct. 585, 44 L. Ed. 701); *Metropolitan Co. v. New Orleans*, 205 U. S. 395, (27 Sup. Ct. 499, 51 L. 853); *Morrow v. Gould*, 145 Iowa, 1; *In re Stanton's Estate*, 142 Mich. 491, (105 N. W. 1122); *Callahan v. Woodbridge*, 171 Mass. 595, (51 N. E. 176); *Hutchinson v. Board*, 66 Iowa, 39; *In re Rogers' Estate*, 149 Mich. 305, (112 N. W. 931, 11 L. R. A. (N. S.) 1134, 119 Am. St. Rep. 677); *Heinz v. Board*, 121 Iowa, 445; *State v. Dalrymple*, 70 Md. 294, (17 Atl. 82, 3 L. R. A. 372); *In re Houdayer*, 150 N. Y. 37, (44 N. E. 718, 34 L. R. A. 235, 55 Am. St. Rep. 642). This is the rule, although the securities may be temporarily absent from the state. See *In re Stanton's Estate, supra; Blackstone v. Miller*, 188 U. S. 189, (23 Sup. Ct. 277, 47 L. Ed. 439); *Metropolitan Co. v. New Orleans, supra; Buck v. Beach*, 206 U. S. 392, (27 Sup. Ct. 712, 51 L. Ed. 1106, 11 Ann. Cas. 732). The main cases relied upon in support of the contrary view are *Weaver's Estate v. State*, 110 Iowa, 328, *Gilbertson v. Oliver*, 129 Iowa, 571; *In re Stone's Estate*, 132 Iowa, 136; *People v. Griffith,* 245 Ill. 532, (92 N. E. 313). In our opinion, none of these cases are in point.

We borrowed our statute from the state of New York, and the interpretations thereof by the courts of that state are quite conclusive here. For this reason the New York cases already cited, and *In re Whiting*, 150 N. Y. 27, (44 N. E. 715, 34 L. R. A. 232, 55 Am. St. Rep. 640), are quite in point.

In *Bristol v. Washington County*, 177 U. S. 133, (20 Sup. Ct. 585, 44 L. Ed. 701), *supra,* the Supreme Court of the United States approved the following decision from a lower court:

'For many purposes the domicile of the owner is deemed the situs of his personal property. This, however, is only a fiction, from motives of convenience, and is not of universal

application, but yields to the actual situs of the property when justice requires that it should. It is not allowed to be controlling in matters of taxation. Thus corporeal personal property is conceded to be taxable at the place where it is actually situated. A credit, which cannot be regarded as situated in a place merely because the debtor resides there, must usually be considered as having its situs where it is owned—at the domicile of the creditor. The creditor, however, may give it a business situs elsewhere, as where he places it in the hands of an agent for collection or renewal, with a view to reloaning the money and keeping it invested as a permanent business.' After citing *Catlin v. Hull,* 21 Vt. 152, *People ex rel. Jefferson v. Smith,* 88 N. Y. 576, *Wilcox v. Ellis,* 14 Kan. 588 (19 Am. Rep. 107), *Tazewell County Sup'rs v. Davenport,* 40 Ill. 197, and many other cases, the opinion continued thus: 'The obligation to pay taxes on property for the support of the government arises from the fact that it is under the protection of the government. Now, here was property within this state, not for a mere temporary purpose, but as permanently as though the owner resided here. It was employed here as a business by one who exercised over it the same control and management as over his own property, except that he did it in the name of an absent principal. It was exclusively under the protection of the laws of this state. It had to rely on those for the force and validity of the contracts on the loans and the preservation and enforcement of the securities. The laws of New York never operated on it. If credits can ever have an actual situs other than the domicile of the owner, can ever be regarded as property within any other state and as under obligation to contribute to its support in consideration of being under its protection, it must be so in this case.'

See, also, *New Orleans v. Stempel,* 175 U. S. 309, (20 S. C. 110, 44 L. Ed. 174) ; *Metropolitan Co. v. New Orleans,* 205 U. S. 395, (27 Sup. Ct. 499, 51 L. Ed. 853) ; *Blackstone v. Miller,* 188 U. S. 189, (23 Sup. Ct. 277, 47 L. Ed. 439) ; *U. S. v. Perkins,* 163 U. S. 625, (16 Sup. Ct. 1073, 41 L. Ed. 287) ; *Savings & Loan Soc. v. Multnomah Co.,* 169 U. S. 421, (18 Sup. Ct. 392, 42 L. Ed. 803) ; *Adams v. Batchelder,* 173 Mass. 258, (53 N. E. 824, 73 Am. St. Rep. 282).

In *Hutchinson v. Board,* 66 Iowa, 35, this court said:

The plaintiff has the money in question under his control and management, and loaned the same for pecuniary profit, and is therefore clearly within the letter and spirit of the statute; and counsel do not claim otherwise. Their contention is that the statute should not be so construed, for the reason, as we understand, that, whatever may be the rule as to tangible personal property, the situs of moneys and credits is where the owner resides; and, as the owners reside in England, such property cannot be taxed here, for the reason that it must be deemed to be in England. It is undoubtedly true that for some purposes, to prevent injustice, a legal fiction has been adopted in relation to the situs of personal property. But this fiction cannot be permitted to prevail in view of the facts of this case. Nor are we aware of any difference between different species of personal property. The fiction, when allowed to prevail at all, applies alike to all personal property. The property taxed is in the possession and under the control of the plaintiff. It in fact is in this state, within the meaning and intent of the statute; and can the courts, by the invocation of a fiction, defeat the plain meaning and intent of the General Assembly? We think not, for it is the undoubted province of the General Assembly to determine what property actually within the state is taxable, and unless the courts can say that the law is unconstitutional, or possibly that it conflicts with some fundamental law that is universally recognized, they are not only powerless, but it is their clear and undoubted duty to enforce the statute. This question was considered in this court in *Hunter v. Board of Supervisors,* 33 Iowa, 376, and has been expressly determined in other states, under similar statutes, in accord with the views above expressed. *People v. Home Ins. Co.,* 29 Cal. 533; *Board of Supervisors v. Davenport,* 40 Ill. 197; *Redmond v. Commissioners,* 87 N. C. 122. We base our conclusion on the fact that, not only is the money loaned and invested in this state, but it is under the exclusive control of the plaintiff, and therefore its situs is here, and not in England, where the owner resides. Some question is made as to the amount of the assessment, but, if assessable here at all, we are clearly of the opinion, for several reasons, that the amount is not greater than it should be. At some time prior to 1882 the plaintiff voluntarily executed his note to

the parties in England from whom he obtained the money. This was done for the sole purpose of thereby avoiding taxation. It may be that, under the statute, it would have this effect, if a bona fide indebtedness was thereby created. The plaintiff was a witness in his own behalf, and, without any apparent desire to conceal anything, has undoubtedly stated the whole transaction just as it is, and therefrom the satisfactory conclusion is reached that the execution of the notes did not create any indebtedness, and it was not so understood. The plaintiff did not borrow any money of persons in England, and he was in no manner indebted to them, but simply acted as their agent for a small compensation. He is possessed of ample funds, belonging to his principals, to enable him to pay the taxes assessed on the moneys and credits under his exclusive control.

The case is quite analogous to the one now before us; the removal of the notes here being the equivalent of the making of the fictitious note in that case. It was a removal in form only, and there is no showing that the agent, Hendrick, parted with any control over the property. Moreover, it is provided in section 1467-e of the Code Supplement that:

Whenever any property, real or personal, within this state belongs to a foreign estate, and said foreign estate passes in part exempt from the collateral inheritance tax, and in part subject to said collateral inheritance tax, and it is within the authority or discretion of the foreign executor, administrator, or trustee administering the estate to dispose of the property, not specifically devised to direct heirs or devisees in the payment of the debts owing by decedent at the time of his death, or in the satisfaction of legacies, devises, or trusts given to direct and collateral legatees or devisees, or in payment of the distributive shares of any direct and collateral heirs, then the property within the jurisdiction of this state, belonging to such foreign estate, shall be subject to the collateral inheritance tax imposed by chapter four (4) of title seven (7) of the Code, and the tax due thereon shall be assessed as provided in the next preceding section of this act, and with the same proviso respecting the deduc-

tion of the proportionate share of the indebtedness, as therein
provided.

And section 1477-c reads in this wise:

No safe deposit company, trust company, bank or other
institution, person or persons holding securities or assets of
the decedent shall deliver or transfer the same to the executor
or administrator or legal representative of said decedent un-
less notice of the time and place of such intended transfer be
served upon the state treasurer at least five days prior to the
transfer thereof, or unless the tax for which such securities
or assets are liable under chapter four (4), title seven (7) of
the Code shall be first paid. It shall be lawful for, and the
duty, of the treasurer of state to personally, or by any per-
son by him duly authorized, to examine such securities or
assets at the time of such delivery or transfer. Failure to
serve such notice upon the treasurer of state or to allow such
examination on the delivery of such securities or assets to
such executor, administrator or legal representative before
said tax is paid shall render such safe deposit company, trust
company, bank or other institution, person or persons liable
for the payment of the taxes due upon such securities or
assets as provided in said chapter four (4).

These, to our minds, indicate that the property was tax-
able here.

As already suggested, if Mrs. Adams had been a resident
of this state and had herself made the deposit of the notes in
the Prairie du Chien bank, there could be no question of the
right to impose a collateral inheritance tax upon the property.
The property was in the hands of her agent, who did the same
thing, and, but for the removal, all agree that the property
was subject to the collateral inheritance tax. Should his
removal of the property to the Wisconsin bank be given more
force than if Mrs. Adams had removed it? So far as shown,
Hendrick retained the same control over the securities after
the deposit as before; the business was left in his hands; and
the notes and mortgages were, so far as shown, subject to re-
call for business use at any time. We are of the opinion that

they were subject to our collateral inheritance tax, and that the judgment below should be sustained.

The judgment must therefore be, and it is—*Affirmed.*

Ladd, C. J., and Preston and Withrow, JJ., concur. Weaver, Evans and Gaynor, JJ., dissent.